Case No. 16-1278, et al., Encor Electric Delivery Company, LLC, Petitioner v. National Labor Relations Board. Mr. Lonegan for the Petitioner, Mr. Casserly for the Respondent, and Mr. Gillespie for the Intervener. Good morning. Good morning. May it please the Court, my name is David Lonergan. I'm here with Amber Rysher, who's sitting at the council table with me. Together we represent Encor Electric Delivery Company in this matter. I'd like to reserve two minutes for rebuttal, if I may. The case involves several issues. Obviously, we'll answer any questions that you have on any of the issues. So we'd like to focus our oral argument on whether the testimony for which Mr. Reed was terminated was protected under the National Labor Relations Act. The Board failed to apply the law, court, and Board precedent in finding Mr. Reed's testimony to the Texas Senate Committee was protected and that it did not lose protection of the Act. The Board reduced the issue of whether Reed's testimony was protected to an analysis of maliciously untrue. Supreme Court, this Court, and the Board have all consistently held that employee communication to a third party only maintains Section 7, Section 8 protection, if it indicates that it's related to an ongoing labor dispute and it is not so disloyal, reckless, and maliciously untrue. The Board failed to apply both parts of this test. So you're not disputing that it was collective action for the purpose of either collective bargaining or mutual aid or support? You just, you want us to go directly to the Jefferson standard? No, we are disputing that it's concerted activity or protected. We don't think it's conservative because he testified he was, based on his own experience, he needs... Well, he said he was there in a dual capacity. I think he introduced himself, said who he worked for, and said he'd recently become manager, the business manager for the union. I don't know that he ever said dual capacity. Well, he became a representative for our local union. He signed in as representing himself and the local, IBEW Local 69. So why isn't that, why isn't it good enough, just on the first prong here, to show that he was engaged in conservative activity? His testimony earlier said it was based on his own personal experience. He also said, I noticed this, I called the union there in Houston and got more information. So he had something to talk about his own work, which would have been both as a union member and as just a person. And then he said, I called the union and got more information about this. So what do we do when you have this sort of two hats being worn at the same time? I'm sorry, two hats what? Two hats, wearing two hats at the same time. Right, I'm here in my own personal capacity and as a union representative. Well, the call to the other union is almost irrelevant to his testimony. It is irrelevant to his testimony, other than it shows it was reckless. And what he said, that union didn't install the same type of meter at all. And they had material differences. No, I'm just talking about whether he was there in his capacity as a union official. Put aside the content of the testimony. Just what was his capacity? He was wearing two hats. He signed in as self and on behalf of the union and introduced himself as a lineman and now a troubleman and a representative of the union. Yes, Your Honor. He testified strictly based on his own experience. He didn't reference any employee concerns. Well, maybe that's his experience as a union member. Yes. Does that not count? Pardon? I'm just trying to understand what your legal rule is for why this is not, in your view, collective action. Just that first part of the test. Yes. I don't think it's concerted because he testified, again, just to his own beliefs, his own testimony, and didn't bring up any employee concerns. But I'd also like to add, Your Honor, if you find it concerted, I think this Court has said that even if it's concerted, that doesn't mean it's protected. And we don't think it was protected either. It overlaps a little, but it's not talking about terms and conditions of employment. It has no nexus to employment. But your strongest point was that it doesn't signal in any way to the listeners any relationship to collective bargaining itself, particularly the collective bargaining process that was then underway. I agree with you, Your Honor. Your Honor, that's why when I was getting ready to talk about the Determination Standard Analysis and your case of application and Indica and Direct TV, I thought I was trying to answer Judge Millett's questions. I think it is that when we made our objections, we said it wasn't concerted, that it wasn't protected, and also said it didn't indicate a labor dispute, it was disparaging, and it was reckless. So, yes, Your Honor, we did make those, and the ones I was going to focus on today were the two prongs of the Jefferson Standard, because he did not indicate that it related to a labor dispute in any way. And I think this Court has held, and the Supreme Court has held, that he had to make it apparent on his communication to the third party that it did relate to a labor dispute. Must it be within the statements themselves, here, the testimony itself? Must that make it explicit, or can it be discerned from context? No, it has to be in the terms itself. And I think this Court has said, and the Supreme Court has said, that the reason for that is it's got to put the listener, the recipient, on notice. But what if the recipient's on notice because the union had been lobbying on this issue, the union directed him to go there, he testifies, says, I'm here, at least in part, as a union member, and then Encore testifies. Can one not discern from that context? Isn't it pretty clear from that context that this is an ongoing disagreement? I think the record would say the union lobbying on that was three or four years prior to this. As far as the context of it, I think you have to make the reference to the labor dispute. Even if there's an ongoing labor dispute, if you don't mention it in the actual communication, then it loses protection of the act. And regardless of what was going on in the board's own standards, they're American Gulf and in Jefferson's standards, in those situations there were labor disputes going on, but the communication didn't make it apparent that it involved a labor dispute. So I think people reading the testimony, people hearing the testimony, media reporting on the testimony, they don't know that it's a labor dispute. And I think this Court has said the logic for making it apparent in the communication is so that the listener can decide for himself, herself, whether in fact it's true or not true. Mr. Mulligan, who's the intended audience here? Isn't it the Senate committee? I think the main attendance, yes, that's the main audience, but it's also public and it's also recorded and there's also media people there. And the legislation here was the legislation that might have given customers, homeowners, a choice as between an analog and a digital meeting, is that right? No, Your Honor, this hearing was strictly for public health issues. The record shows the Senate governor's notice to the committee hearing was that it was a public health issue for Texans. And that's what the hearing was about. Public health issues relating to? Smart meters. Okay, and the public health issue was with the smart meters, not with the analog meters? That's correct. It was with the installation. Well, it was in different views as to what the dispute was about. That dispute. That dispute. I was answering questions on the dispute that focused on the hearing. Was there any clause offered by either party in the dispute over the CBA speaking to smart meters? No, Your Honor. There was a pre-negotiations in August and they were like Mr. Reid put in 22 or so proposals. None of them had anything to do with smart meters, their impact. Then the day before the testimony, they sat down and they negotiated and Mr. Reid presented about three proposals, I think, overtime and rest time, but nothing about smart meters. The company proposal had nothing about smart meters. So in answer to your question, no. The proposals were totally divorced from smart meters or any impact that they had. Mr. Lonergan, my impression from the record was that Encore had offered a one-year extension of the underlying collective bargaining agreement because of the possibility that state legislation would move. And I think that's the legislation relating to smart meters. Is that right? No, I don't think so, Your Honor. I mean, I know that quote's in the record, but there's all kinds of legislative activities going on in Austin and it wasn't necessarily about public health on smart meters. What's your understanding about what legislation they were referring to? I actually don't know. I know that quote in the record. I don't think it's developed in smart meters or anything. And on the final prongs of the Jefferson Standard test about prongs, the final aspects, the components about whether testimony is so disloyal or maliciously untrue, who bears the burden in your view of establishing those elements? I think the board has to establish that. I mean, the way the test is up, they've got to show that it didn't lose the protection of the act because of those two things. Although the issue here sort of tees up labor right against an employer's prerogative to fire for cause. I'm sorry, labor what? A labor, an asserted labor right versus an employer's prerogative, asserted prerogative to fire for cause. And in firing for cause, wouldn't it be the burden of Encore to establish that notwithstanding the right to engage in concerted action on the part of a union leader, that it nonetheless has cause that is strong enough under Direct TV to trump the concerted activity, i.e., that it has cause because of the testimony that's so disloyal or maliciously untrue? No, I don't think it's the employer's burden. I do understand your point that there's got to be some balance between under 10C, employer's right to discharge, and under Section 7 and 8. But in this case, it's like Jefferson's standard, the balance. There's no underlying grievance to balance. He doesn't have an issue about smart meters that he mentions in his testimony at all. Okay, well, if, just assuming for purposes of the question, that we've reached that point under the Jefferson standard analysis, where there is protection for the third party appeal, and I know you contest this, but if we were to hold that he had adequately indicated the relationship to either ongoing labor dispute or mutual aid or protection of employees, then the question is, what next and who bears the burden? So I'm assuming that we have found that there's some protection that's kicked in, and then the question is, in rolling that back based on disloyalty or malicious falsehood, wouldn't that be the employer's burden? I don't think so, Your Honor. I mean, I think it's still on the board. Of course, we contested what is protected. It's a defense, though, right? Pardon? It's protected, and now you want to say that protection goes away. Are there other instances under that? Well, I don't think it's indicated as protected if it doesn't pass those two prongs. I mean, isn't that still part of the analysis? I mean, the Supreme Court, I don't think, broke it up like that. Well, it's spoken up in terms of you lose the protection. So you can't lose protection. When those two Jefferson standard prongs are met, you lose the protection you otherwise would have under the Act. That's how it's spoken of, and you can't lose protection if it hasn't attached. I mean, are there other contexts in which conduct is protected, but that protection will go away under the labor law, based upon certain showings, where those factors for taking protection away are part of the affirmative case rather than affirmative defense? Are there other examples that fit this model? Maybe strike or misconduct. I mean, strike or conduct is protected, but if somebody's doing something wrong, violence, language, that type of thing. And the board has to prove no misconduct, or do they show it was strike or conduct, and then the company comes in and says, hang on. Here's what they did, and this crossed the line. Okay. Maybe I meshed it all together wrong, but I think the board has to prove that the conduct was true strike or misconduct, and not violent or whatever the other issue is. All right. I think we'll hear from the board now, but we'll give you some time on rebuttal. Thank you, Your Honor. Thank you. Good morning, and may it please the Court, my name is David Casserly for the National Labor Relations Board. Can you answer this burden of proof question? Yes, Your Honor, and I think that goes to a pretty central disagreement in this case. Under board law, the affirmative defense is the Jefferson Standard, so not just the loss of protection due to malicious or maliciously untrue or disloyalty, but also the ongoing labor dispute, loss of protection because that's not sufficiently indicated in the communication. That is all an affirmative defense that is part of the employer's burden of proof to bring to the board. What the general counsel before the board has as the board burden of proof is the first step, whether it's concerted and whether it relates to employee terms and conditions of employment. Are there any circuit court cases on that from our court or others on that burden of proof? Well, Your Honor, so Mountain Shadows, I believe, was enforced, and that is the standard of this. That's the genesis of this standard. This court has approved the Mountain Shadows test explicitly in Direct TV. The Direct TV didn't direct. But the court also said it's not an affirmative defense. You characterized it as an affirmative defense, and I take it that if it's a defense, it's a defense not in the sense of affirmative but in the sense of just an ordinary defense that knocks out an element of a claim, and it may well be the employer's burden in all or in part, but in Hermel, it was characterized as not an affirmative defense, which has implications for pleading, for example. I guess, yes, Your Honor. The point is that it's a defense with the burden on the employer. So in this case, it's undisputed that Mr. Reed was fired for his testimony before the committee. That's not something – there's no motivation issue. We know what the motivation is. So in that case, what the board had to answer was whether his conduct was protected and then whether the employer had determined, had adequately bore its burden of proof in showing that it was not protected after that it lost the act's protection. And that's where the ongoing labor dispute issue comes in. What is it that put a Texas legislator on notice that there was a link here between Reed's testimony and the bargaining negotiations? Your Honor, under board law, the link required to determine if it's protected in the first place under the general counsel's burden isn't an explicit link that it makes. It just means to relate. What's an implicit link? What's an implicit link? Well, he mentioned that he was part of the union. He started with a story about how he had gone to a low-income customer's house, how he had to explain to this customer that there was damage to this customer's property, which was part of this meter base, and that they would have to pay for the damage. So that was how he started it out. So he started out with a complaint about an employee issue, specifically. It seemed to be a customer issue. But it's also an employee issue. But was the union bargaining for some sort of protection against having this hazard, the hazard of having to respond to these dozen orphans who were being injured by the smart meters? No, Your Honor, the union wasn't specifically in bargaining about that. It was not bargaining at all about it, right? No, Your Honor, although it's not required for the text. It requires that it relates to employee terms and conditions of employment. It doesn't necessarily have to be. Certainly the reasoning of Jefferson's standard seems to be that does the audience have notice that this is part of coercion, to use the court's term, or leverage, as Mr. Reed, using Mr. Reed's term, or is it something that they're actually bargaining over, which they certainly were in Sierra Publishing, well, not in Jefferson's standard, but in Sierra Publishing, the one case you cite on the point. Yes, Your Honor. Although, to be clear, it's not just entirely about collective bargaining. I mean, in Direct TV, it wasn't a collective bargaining issue that they brought to the customers. It was an issue about complaints about management telling the employees to lie to customers and those sorts of things. There's no evidence that there was bargaining about those specific statements. No, but that was an employer telling an employee to do something that employees didn't want to do, and I think it's pretty self-evident. Employees don't want to have to lie to customers or make misrepresentations. But what in his testimony for the Jefferson prong, so not for the protection prong, collective activity, for the Jefferson prong of putting the Senate on notice that there was an ongoing dispute between the union and the employer about these meters, what in his testimony did that? So two answers to your question, Your Honor. First, to answer directly, it's fairly similar in that he started out with this complaint about having to go to customers. Note that in Direct TV, the employees there tailored their message to their audience. They said, you, customers, are being lied to. They didn't say, we're being forced to lie to you. And it's okay for employees to tailor their message to the audience. And here, Mr. Reed realizes that there's more customers who are covered by the Senate committee's jurisdiction than there are employees. He makes his complaint about going to this woman's house and explaining to her. But it's tailored to the audience because the audience was not looking into labor problems. It was looking into customer health and safety. It wasn't looking into this unemployment matter at all, and so he comes in and testifies about customer safety and customer dissatisfaction. Yes, Your Honor. And how that shows that he and the union and Encore are in a battle about these meters that actually has nothing to do with safety of the consumers as opposed to safety of the workers. Well, Your Honor, I don't believe that the committee hearing explicitly stated that it was about safety of consumers as opposed to workers. Workers are people, too, and they're covered by the jurisdiction, and I don't think that was an unreasonable complaint to bring upon. Where does he talk about employee safety in his testimony? He doesn't directly talk to it, but he does talk about the meters burning up and these images. It happens when they're there just as it happens to happen after they install them and leave. That's true, Your Honor. As I understood it, the board's position is that there is protection for this kind of overlapping, pursuing the overlapping interests of the workers and the homeowners, and that here there's a long history, indeed a history with this committee, of testimony regarding smart meters and opposition from the union on the part of workers and that this is but the latest iteration of testimony before the Senate and included by President Obama and Mr. Cronin. Is that not right? That is true, Your Honor. And what about the assertive bond or nexus between the collective bargaining agreement and this testimony? Mr. Lyon said that it wasn't clear why the one-year extension was offered, and I had the impression because the ALJ had made that connection in the opinion, page 13, that apparently referring to the union's attempts to get an opt-out for smart meter customers at no charge, that they're talking about what the legislation is that leaves things up in the air and requires this one-year extension. Is that your understanding? And can you tell us more about the connection between the ongoing bargaining? Yes, Your Honor. Mr. Reed's impression was that they offered the one-year extension and said because of developments in the legislature. Who said it had to do with developments in the legislature? That was the employer's head negotiator, Your Honor. Told that to Reed. Told that to Reed. I think it's true that the testimony doesn't explicitly state what developments were due to happen during the legislature, but Mr. Reed took that as being related to smart meters. And what's the exact link there? Is it the uncertainty or the whatever new expense the legislature might impose on CORE? Or something else? Or a third thing? I mean, I'm not sure how it – I mean, in bargaining over contracts, who wants long and who wants short must constantly fluctuate and must depend on other terms in the agreement. Yes, Your Honor. It must be something – it was reasonable for Mr. Reed to infer that ENCORE expected something to change or something and wanted to be able to bargain again in a year after that change had taken place. But it's not clear exactly what that was. The testimony doesn't say what legislation in particular. It's reasonable to think it is this opt-out. The opt-out ENCORE has said would have cost it considerable money and also would have been fairly lucrative for the union in terms of jobs. The union has lost a lot of jobs to the smart meter deployment. Can we go back to your earlier statement about the – or concept about the necessary link between the bargaining and the statement? Is it your position that if a union member identifies himself as a union member and then makes a disparaging statement about the product, that disparaging statement is automatically protected? If it identifies itself as a union member, it must have something to do with union interests. And the union always has an interest, presumably, in the firm prospering. So, Your Honor, in determining whether it's protected in the first place, the disparaging comment wouldn't be considered. But in determining whether it has lost the protection of the act, which is the employer's burden in that case, yet that the disparaging comment is considered, it's a balancing test under Direct TV. So the question with the disparaging comment is whether it's so disproportionate to – grossly disproportionate to employee concerns, to legitimate employee concerns. And if it is, then it's not – then it loses the protection of the act. But here the board found that it wasn't, in part because the – as the board said, he didn't mention Encore smart meters. This wasn't in particular about Encore. He, in fact, explicitly mentioned CenterPoint as well before he made the comment about these meters causing damage to people's homes. Yeah, I don't know that it's anything less disparaging. So they work for Encore. To other people who are probably not in competition with Encore. But it's not – Encore is a distributor, right? That's true, Your Honor. Encore doesn't actually create the smart meters. It installs them. It's the electricity company. It's also not a distributor. I mean, it's a distributor of electricity, not a producer. Yes, Your Honor. But there's not really any – I mean, so there's a question about the link with the collective bargaining, which is somewhat opaque. But if it doesn't connect to the collective bargaining, it would suffice if it connected. For the purposes of the first part of the Jefferson Standard test, it would suffice if there were a connection to the workers' interest in safety and not being yelled at by customers and whatever. Is that right? Yes, Your Honor. And to be clear, the Board's position is that the first part of the Jefferson Standard test was not raised to the Board as part of the loss of protection analysis. I think the line of questioning here suggests a different meaning on the part of justice. I understand, Your Honor. So, well, I'll briefly defend it and move on then. But the Board – again, this is a difference in burden of proof. These are two separate analyses. And the Board addressed it as it was brought to the Board, which was that this is part of the first initial step as to whether or not it's protected. The Board addressed it in that context where the standard is different, where the standard is not related to necessary – it's not the same balancing test that happens under Jefferson Standard. And under whether it's protected or not, it's clear under the Board's decision that this was related to employee concerns sufficiently. Can you give me a hypothetical of a disparaging statement by a self-identified union member that would not be fully protected unless it was maliciously false, that would not be protected in the sense that no sanction would be imposed for it? Sure, Your Honor. There are a few in the case law, such as – let's see. There's one case, Five Star Transportation, where the Board found that a statement, which was clearly made by a union member, that the buses were poorly maintained buses from a substandard company that employs criminals. That was a statement. So, how does that relate to labor-management relations? It sounds very clever, doesn't it? Well, it was part of the – Employment. For the employee. Your Honor, as I understand your question – Do you think your argument for it sounds pretty absolute? No, Your Honor. Again, under Direct TV, it is a balancing test against the interest. I do realize that the Eighth Circuit has stated that it thinks the rule under Direct TV is an absolute rule, but it is a balancing test under Direct TV. You said it relates to employee issues, but isn't the test – would it relate to a dispute, an employment dispute? Is there enough under Jefferson's standard that relates just to an employee issue? Your Honor, there aren't any cases that really differentiate enough between the two. Well, where's the case where they've applied it to an employee issue that was not a dispute? Well, I guess, again, in Direct TV, this isn't a collective bargaining issue. This is a – There's clearly disputes between management employees, and in fact, that first crime of Jefferson's standard wasn't even in play. Everyone conceded that there was an ongoing labor dispute about their behavior and their pay and the effects on their paychecks and what they were being told to do. So is there a case where there was an employee issue, which is how you phrased it, that was not a dispute that sat outside Jefferson's standard? Not that I can think of off the top of my head, Your Honor. It's not that they haven't distinguished. It's that there's no cases that have gone there, that we have to find, as Jefferson's standard articulated it, an employee-employer labor dispute that folks were put on notice of, the audience was put on notice of. Your Honor, I'm not really sure that there's a whole lot of difference between employee issues and an employee dispute. I don't think employees generally complain about their issues if there's not some kind of dispute with the employer about them. I don't complain. I can go testify. Just here's my information. I'm an expert. I do this every day. Let me tell you how it works. Here's what's going on. It doesn't mean I'm in a dispute. It doesn't affect my relationship with my employer, even if it's something of interest to the legislature. That can happen all the time. It can, but where would the alleged disparaging statement be in that analysis? It could be on something that's maliciously false. So if an employee... Again, the test, as I understand it from Jefferson's standard, it has to be involved in a dispute, and it says dispute, that the audience has to be on notice of. Not that it relates to something that the employee does, because as you just said, that will be every case, or almost every case, will be something about what the employee does. So an employee issue is going to be very different. It's a much broader category than employment disputes. Well, let's say, Your Honor, I do think here it's clear that Encore and the union had a dispute over the smart meters. Why is it clear? It's clear from the union, the union of lobby, that committee over the smart meter issue. It has asked for this opt-out. The dispute is so far under the radar that there's no bargaining related to it, except possibly the peripheral term with the CBA. Now, then, this bargaining cycle, Your Honor, that's true. Any previous bargaining cycle? Well, I'm not sure they're in the record, but there is testimony in the record about the union having lost a lot of jobs to the smart meter deployment some number of years ago. That's a good point. I assume that's what they were lobbying over. Is there any evidence that they were, within a year of this hearing, lobbying over employee safety in installing these things? Not within a year of this hearing, Your Honor. Any evidence they were lobbying about employees having to put up with angry customers and the effect that has on their work environment? Also not within a year of this. What is the legislative context, just to remind us? Because my understanding is that there was a clear battle line and that the battle had gone on for a decade where Encore had testified, the union had testified in many different hearings on the question of the smart meters, and the union was trying to say, don't do, don't use these. They're, you know, killing our jobs, and by the way, trying to get allies. They're terrible for you too, homeowners. What is the state of play on that, the context that would have been apparent to this very committee? Well, the context on that, Your Honor, is that the union had lost that battle, really, and that all the legislation allowing these smart meters to go into effect had been passed a few years prior. And at this point, the smart meter rollout was mostly completed. Encore had, I think, something like $8 million total to do or something along, or the state of Texas, I guess, had some number of million and there were only a few hundred thousand left. So the union had mostly lost this battle. This hearing comes around as an opportunity to at least reopen and gain an ally in getting some sort of opt-out from some of that. How realistic was that? I mean, given your characterization, these smart meters are installed. It's somewhat quixotic to think there may have been some bill about giving consumers opt-out, but it's not going to bring back jobs. If virtually every household already has a smart meter and maybe a couple of the people in that remaining tidbit of the market could say, oh, I want to keep my analog meter, but that's not going to bring back a rush of jobs, is it? Maybe not, Your Honor, but Section 7 protects employee activity regardless of its likelihood of success. And that is true in most cases where a union is lobbying or when an employee goes to testify and things like that. Was the union lobbying at all at the time of this testimony? And I'll give you six months before, six months after, whatever. Well, I guess not after, but six months even before, were they still lobbying or were they done? They said they could have lost the battle and moved on. Well, Your Honor, they were mostly – I don't think there was any direct lobbying within six months, but they were still keeping abreast of what was happening. Yes. But that's not the same thing as – I'm sure the union is keeping abreast of this thing as part of their job, but that's not the same thing as putting anybody on notice that there's an ongoing labor dispute over these meters. Well, Mr. Reed did find out about the hearing in the first place from the union's attorney who forwarded him the hearing notice, saying he couldn't do something otherwise. No, I get that, but the audience didn't know that, right? The audience to which he – I think I thought we were asking here what the audience to which he testified would have known. I don't think there are any record communications in the past six months between the union and – This year? I don't know when the last lobbying communication was. The last ones that are in the record, I think, was about two years before this statement. But there's no reason – you know, the union at no point said to the committee, we have abandoned this issue and we're not going to – Like you might have said, we're still hoping for some gains from suitable legislation, and we're – and actually we feel that pressure from the legislature would make ENCOR a yield in various things we're actually bargaining about that were for the candidate to do. I understand the act doesn't require tenure. Yes, we could have said that, but that doesn't seem like the – I mean, that wouldn't be tailoring their message to the audience. There's no reason the audience would really care. No, at that point, clueing the audience in on what was all really about would be quite helpful. What is the point of that first part of the Jefferson standard test, having to let people know about an ongoing labor dispute? Is it to disclose your conflict of interest, or is it just to substantively connect the testimony with protected activity? Your Honor, it's to balance against the later two issues as to whether it was maliciously untrue or disparaging. In other words, if there's – if the listener knows that there is a large labor dispute going on and these two sides hate each other and they're lobbing things back and forth, something that was otherwise disparaging might seem a little bit less so. And so the three problems are you determine first the level of employee interest, and you need that sort of proportionality. It wouldn't seem less disparaging, but it might seem less credible. Isn't that the point? Well, to me, that is what the court in Jefferson standard was driving at. That could be true, yeah, less credible. But the effect on – You know, there was very incredible testimony. The likely effect on the audience is really the focus of Jefferson standard and how likely the audience is to take this with a grain of salt. And here, again, the second part of that, the second part of that balancing, the level of disparagement, he's not going out and taping flyers on doors saying Encore smart meters are going to make you sick. He didn't do anything like that. He testified before a committee that was having a hearing on the issue, and he didn't limit his statements to Encore. He did as fair of a job as he could in terms of testifying broadly about the issue. It seems like the issue, the content of his testimony is that he did his homework before he went in. He talked to people. He realized there was a widespread problem. Then he came in, and he said he'd had these problems, and he'd seen these things burning up. But then it turned out the tickets didn't actually reveal that information. Does that count as false? If a problem is actually happening, but you weren't a firsthand witness, but you get up and testify as though you were a firsthand witness to it, could he talk to a bunch of people? Does that count as false? It's false in the sense that he purported to be testifying about personal experience, but it wasn't actually personal experience. On the other hand, the meat of the matter, these things are burning up, seems to at least have evidence in the record. Well, your Honor, when he testified about these things that are burning up and causing damage to people's homes, that testimony was not linked only to his personal experience. His personal experience was the first part of his testimony where he talked about going to a customer's home and having to tell her that her meter base was burnt up and that she would have to replace it. When he said that, I noticed that the tickets I worked on or the work orders that I went out on were beginning to be increasingly of the meters burning up and burning up the meter bases. So that's before he starts telling the story about the lady. That's true, your Honor. Was that true?  He identified a few. It's not clear that the smart meter caused those from his ticket, but it's also not clear. It's increasingly of the meters. Let's just assume that maybe that was not so accurate. As to his personal experience, but he at least had heard from other people when the fire marshal was going on. I don't know. I'm baffled by it. You heard from his personal experience that others were having this problem. So what does, does that count? I just don't understand. I didn't see the board wrestling with that issue. I can imagine a union person sort of taking it on to protect the identity of other people who don't want to be named in testimony. I just don't know how the false prong works in a context like this. Well, your Honor, it has to be maliciously or recklessly false. So in this case, there's no malicious act in presenting something that he thinks is true but might be perhaps somebody else's testimony as well. I think it was true as to his personal experience, but he thought it was true because it was happening to his colleagues and people in the union knew about it and the fire marshal knew about it. But, your Honor, he may have actually thought it was true about his personal experience, and he certainly testified at the trial here that he did because he testified that he had these increasing tickets and maybe these tickets didn't show an increase, but if you know that you've had tickets about meter bases and damage to them and then you go on and talk to a bunch of people who say that this has been an increasing problem of late, it's quite reasonable to think back and think, oh, yeah, maybe my meter tickets were increasing, even if, you know, you didn't review them ahead of time and you didn't know that the data might not exactly precisely back that up. So I don't think that's, yeah, I guess I reject the premise that he knew that what he was saying was not true in terms of his own personal experience. He didn't show much interest in the truth, though, right? He didn't pursue the matter as someone determined to get to the bottom of it would have. Your Honor, he talked to a fire marshal before he went up there. He talked to another union local, Local 66 in Houston. They weren't using this kind of meter, right? But none of the testimony refers to any particular kind of meter. They were using smart meters. It's just not the same brand that Encore uses. And at no point during his testimony is he talking about any particular brand of smart meter, the Landers and Geer or otherwise. And the third thing he did was he talked to the people in his repair shop who then told him that they had been receiving more damaged meter bases coming back for repairs. So, I mean, he had, so he has insights having talked to the fire department, having talked to Local 66, his own experience, the council steward had said there were five lawsuits based on, from homeowners based on damage and fires. And I thought the supervisors, Efrin and Anderson, had also acknowledged that there were some fires started by these bases and or meters. Yes, Your Honor. So there's some factual grounding for his testimony in this record. Yes, Your Honor. Yes. All right.  The court has no further questions. Thank you, Your Honor. Good morning. May it please the court. I'm Howard Gillespie from Dallas, Texas. I do represent 5EW Local 69. I'd like to start out by saying this has taken a long time. It's a five-year process since Mr. Reed was invited to go to, actually told he should go to Austin to testify if that's what he thought he should do. And then he got fired for doing what he was told he should do. He's a 34-year employee when he's fired. And so I want to frame this two-minute-side guy, which was the same amount of time that he had, with saying that what's at issue here is how fragile are the rights that you have when you're engaged in protected, concerted activity? How fragile are they because of the Jefferson standard to protest? And I suggest that they're not fragile. They shouldn't be fragile. And I want to really focus on Judge Millett's question and Judge Williams' question because I think there's an interplay between them. Judge Williams' question I think the very first of the day was, how do you get the union committee or the legislature on notice that there's really a labor dispute here about this? And then your question was, what's the interplay? What's the purpose of the first prompt of the Jefferson standard? And those two go together. And I want to address yours first, Your Honor. The purpose of the first prompt is because there is a balance, and the balance is between giving context to the listener so that they know that these statements by Bobby Reed, who's sitting out there today, these statements by Mr. Reed are in the context, I'm saying this as a union representative. And so that way, if there is something disparaging, it's not considered to be as harmful. That's the purpose of it. And then the other part of it, the other problem with the Jefferson standard is how disparaging is it? Well, on your understanding of that first prompt, then it sounds to me like it's completely redundant of the first prompt, getting the stuff protected in the first place. It has to be collective action. Well, that's not quite how we work. Well, it has to be collective action. You said if you dare testify in the capacity of being a member, which is going to make it collective action, that's also going to satisfy the first prompt of Jefferson standard. At least the case law so far to me sounds like it's a little more specific. I think Judge Williams' question suggests that it is more specific, and that's why I want to go there. Okay. And I'll go there. I do want to set this up with just a really quick anecdote. If you're told to do something, and then you do it, and then you get fired for doing it, the first thing to do is to testify. I wasn't told to testify. Go ahead and do it if you think you can do it. No, Your Honor, let me go to what the record is on this. On August 23rd, they met, the union and the company met, to talk about how are we going to negotiate. They set up their first negotiation session for October the 8th. But on August 23rd, when they had that meeting, Davis, who is the director of labor and employee relations for the company, says we're going to be dealing with smart meters at the upcoming legislative session. So the very first negotiation session, which is October the 8th, the day before that legislative session, the read says if we can't make it, we're here to make a deal. If we can't make a deal today, I'm going to Austin tomorrow to testify about smart meters. And so, Your Honor, you were asking whether there was anything to do with bargaining and smart meters. Everything was to do with it. Because literally, had there been a deal made on October the 8th, there's no testimony in Austin by read. Can you explain the relation? I'm sorry, go ahead. All you're saying is the testimony was a letter. At least what you just recounted. You may wish to imply more. No, I got quite through with the sequence. The next sequence was after he says I'm going to be in Austin to testify about smart meters, Davis says is that a threat? Read says no. Davis says, and this is absolutely key, says if you think you need to testify, that's what you need to do. I don't see that as a threat. If you do what you need to do, you're going to make your decision and take the consequences. I don't see that as any promise. I don't see that as any promise that that's protected or anything. But I do see the connection. If Davis is referring to the very hearing that he says is related, I'd like to know more about what your view is of the relationship between the one-year extension and whatever pending legislation. Well, has there been a deal on October the 8th? There's no testimony by Read in Austin. That's just it. Judge Williams said the lever point. And Jefferson Standard itself specifically said that hope for financial pressure on the employer as a result of testimony is not sufficient. That is not acceptable. I want to keep going on. I understand. I'm going to answer both your questions by focusing on what Mr. Read did to put the committee on notice that there was a labor dispute over smart meters. He said something and he did something. And he only had two minutes to add. But before those two minutes began, look at the record, page 451. That's an important page. Because on that page you've got a witness list, and this is the record. On smart meters, there's an against. Which page? I want to make sure we're on the same page. 451. There's an against, and there's then on. And Bobby Read signs up self, semicolon, IBEW local 69, Dallas, Texas. And then when he testified, you've got that in the record. That's on page 12 of the record where the full speech, the two-minute speech is in the record. He starts out by saying I became a representative for our local union there in Dallas last April. So he's testifying that he's Bobby Read. He's a representative of the union. And then right after he signs up, ENCOR signs up as for smart meters. This is a legislative committee that has been lobbied in the past to have an opt-in, sorry, an opt-out procedure. And, Your Honor, Judge Pilger asked wouldn't that be futile. It's really not. I mean, the option here was to have you opt out. Read testified in his short two minutes that what's going on is they're having to replace a lot of these things. They're burning up. And so when you go out there, they need to be replaced either with a digital smart meter or with an analog smart meter. So an option is to replace these things with the analog ones that don't pick up, that don't, the meter bases don't burn. And what about this one year? Is the, I don't entirely, I mean, I see there's these two prongs here. One, if it relates to collective bargaining, and two, if it relates in some other way to employee interest and protection. But, and I see that the board has relied on those two as alternative grounds with one of the members dissenting from the leverage point. On the collective bargaining connection, the employer says, well, things are up in the air. We want to wait a year. Why? How is that going to clarify things and affect the context of the negotiation? The context was we want a short contract, we being the company. We want a short contract. Because there may be some changes in the legislature on smart meters, and that may affect how long we want this contract to go. So that was the context of it. And Reid, who is trying to get a deal done on October the 8th, and it's not realistic, but he wanted to do that, doesn't get that done, does go to Austin. And the committee, the legislature can put two and two together. They have common sense. They know that the union, this is a union, IBEW. It's a statewide type deal. They've got one local here in Dallas, but they work with people all over Texas. And they've been trying to get the legislature to focus on smart meters, and Senator Corona literally said to him, to Reid, during the short two minutes, said, in response to what Reid said, that's interesting. That will be something we will want to take a little further, want to look at a little further, I'm sure. So there was an interplay between them, and he's talking for the union about problems with smart meters, and the company is about to get up, and they did get up. And they talked in favor of smart meters. And you asked who was the audience. The audience was not just the legislature. It was the public, and it was that Encore guy who was sitting out there about to speak, and who went back and told on him by saying, hey, Bobby Reid testified. You want to listen to what he said. And so when you ask whether or not that's disparaging, it could hardly be disparaging when Kyle Davis knows Bobby Reid, if he goes to Austin and testifies about smart meters, he's not going to be saying I love them. He's going to be saying there are problems with them. Sorry? You're taking this account as nullifying the disparaging? No, I'm saying that it could hardly be disparaging. I'm saying the company would not reasonably view it as disparaging if it literally said, if you want to testify about Go, knowing that Bobby Reid would have an opposing view of smart meters. Bobby Reid would be saying, as the IBW, we want you to be able to opt out of having smart meters. And, indeed, there's been a long history. I was just looking at JA384, the email from Bobby Reid in his capacity as a business manager of the union to legislative staff the prior year, talking about how the union is working diligently to get HB3205 to a hearing, and how the safety issues, the defective smart meter issues are of importance to the union, the burning up and all of that. So there's a history here between this committee and the union, and the union's position is understood as a labor position about the nature of the job, the number of the jobs, the safety of the jobs. This all connects to another question you asked, and that was, who's got the burden on this? The burden of proof on this is on the employer who's trying to strip away protection of the act for the head guy in the union, who's down there talking on behalf of the union. Can I get back to the email that Phil just referenced? It says they're working diligently to get HB3205 to a hearing. Was the hearing that happened the next year on HB3205, or was it on a specific bill, or was it just invested? It was on problems with smart meters. It wasn't on a bill. What did HB3205 do? It could have led to a bill. There was an HB3205 he was talking about the year before. We will continue to work diligently to get HB3205 to a hearing. What did HB3205 do? I don't think that was a bill that was live at that committee. I think that what was going on with the committee was it was an open forum for people, the public to come in, and the public included the union, to come in and say, hey, there's problems or there aren't problems with smart meters. And so when the board heard this, the board has come to this just as the legislature does. The board, the LRB, listened to all this evidence, and they had sufficient evidence that both prongs of Jefferson's standard had been met. You're not arguing that Reed would have gone to Boston and given this testimony if a smart meter had been used. You're not saying that Reed would have gone to Boston on that day if a CPA had reached. In fact, I think it should be emphasized that it was the opposite. If a CPA had reached, no way he would have gone to Boston. That's what he literally said. That's what the record shows. He said that. And it was so to go. And yet there's no clause being put over the connection with the CPA. It doesn't relate at least in any direct way. A CPA, an overall CPA, is based upon everything in it. And it's not uncommon, Your Honor, as a union lawyer I can say this, for a union to say, I have an agenda. And the main agenda is to get a good contract for our people. But if there's not going to be a good contract for our people, let's deal with more issues than we're dealing with right now. And this was their first bargaining session. That would be great. There's no finding by the board that this was an effort to get the smart meter topic on the collective bargaining table. Was there? I mean, the problem with the leverage thing, which Mr. Reed was explicit about and the board addressed, was that seems to be in the teeth of Jefferson's standard, that you can't simply use it as an arm twist. You hoped for pressure on the employer. So we can't do that. So we really have to reach out. We're bound by Jefferson's standards here. So we're not the audience. We can change that. And that seems to require a more direct or explicit connection. And we're kind of struggling with that. I think that our focus is too narrow here. If you look at the Second Circuit, misery according to the hospital.  It sounds like a terrible name for a hospital. But in that case, the nurses went out and they wrote a report that said it's not sanitary, it's not safe, it's not good stuff, wrote a report, and they got called in after writing the report and said, if you wrote it, you should resign. And then they found out who wrote it and they fired some people. Imagine if the same people who wrote that report had been told, write a report. We want you to write a report. And then they got fired. They were engaged in a dispute with the hospital about conditions. Well, it starts to sound like we're merging whistleblowing into collective bargaining, right? No. When we think about nurses coming out and saying, hey, this place is unsanitary, assume it doesn't probably have health effects on them, but assume it didn't. Or they're just complaining about bad bed sheets that give people bed sores. All right? That's what they're complaining about. It sounds like whistleblowing. They're not negotiating, presumably at the union, about the bed sheets for the patient. It sounds like whistleblowing for a consumer issue. Isn't that what's going on here? It's concerted activity. And so the point here is that Jefferson Center is ñ Well, I think it's concerted activity, but we still have to put in the audience on notice that I'm here testifying about a dispute with my employer as opposed to I'm here whistleblowing about a problem for consumers that I happen to be a firsthand witness to. In two minutes, possibly he could have said, I'm here for the union, and I want to tell you the union has historically had problems with smart meters. We think they're a bad idea. There are problems with them. We think that as a union. We've raised that with the company. And the company is about to speak, and it's going to say that they're good. He could have said all that, and how many of those people might have been able to say that? Why do they think they're a bad idea? They're bad for customers? Yeah, they keep having problems. They keep overheating. Customers, right. And that's for customers. That's also a problem for the employees because they've got to go out, and they've got to fade the heat. I mean, pardon the pun, but they've got to go out and deal with the unhappy widow, a woman who has not only lost her electricity, but now has to go out and spend some of her money buying a new meter. Well, I'm understanding this through the lens of what the board says and what the record appears to support, which is that Reid's testimony concerning smart meters and meter bases related to and was spurred by an ongoing legitimate concern of the union about the safety of represented bargaining unit employees working with the meters, particularly given the hazards of electrical arcs. Right. It's not disputed the safety of the new devices to workers was one of the reasons the union's attorney informed Reid at the upcoming Senate hearing. Supervisor Anderson admitted that there were troubleman complaints, and there's another supervisor who acknowledged that. Right. So I take it to be overlapping. It is both a consumer-homeowner concern and it is a worker concern, whether or not directly related to the collective bargaining, it is something that the union cares about on behalf of its workers. Is that a different theory from the one you're proposing? No, I think it fits into it. It's a union concern. It's a worker concern. There was a problem with arcs. Bobby Reid testified that he had been burned by an arc and his son had been burned by an arc. And he testified that an arc is a ball of fire. He didn't testify to the Senate about that. That wasn't testimony he gave to the Senate. At the hearing, he said, I know a thing about heat, about fire and heat. But he didn't say it. That's correct. In his two minutes, he didn't do what he did in two days in front of the board. There's two different testimonies to that. But he also testified about them saving jobs. I mean, there are jobs, the smart meters are costing jobs to folks. Now, that was testimony that certainly came up in front of the board. I'm not sure that it's in his two-minute speech to the commission. And the two minutes that you've had here today, that's a different two minutes from the one that Bobby Reid had. You gave me so much time. I really want to thank you. Thank you. Thank you very much. I think Mr. Lonegan used up all his time. We'll give you three minutes for rebuttal. Just a couple of things, actually, to start off with, if I may, Your Honor. Your Honor, the memo that you mentioned from Reid to the joint exhibit 384, smart meters and the local, that's not an Encore. It's not an Encore. That's a different issue. That's separate. I found meter, the one that you asked Mr. Gillespie about. Sorry, are you talking about the email? Yeah. I'm sorry. Yes, Your Honor. And your point about it is? Well, just I didn't want that. That it's a center point? Yes. That's not an Encore. And that's not an Encore type meter. Well, I don't think it's talking about it. It's a smart meter, though, right? A particular meter. It is a smart meter. The issue of smart meters. And he's talking about connecting with Local 66. Yeah, we get that there are different models, and that the company is paying attention to the safety. There may be a differential between the different models. Thank you, Your Honor. Also, there was some merging between employee health, I'm sorry, about public health and public safety. JA443 is a letter from the Lieutenant Governor that sets out that this is strictly a hearing looking into the health. What page is that? That's 443, Your Honor. I'm sorry, looking into health. To health. Who's health? To not jeopardize the health of Texans. Well, that would include the employees. Yeah, and then it goes on to talk about the public. But there was some issue whether that committee was tasked to look into safety, and it was a health. Well, safety is part of health, right? I mean, right? Exposure to health risk would be part of health and also a safety issue. I'm not sure we can divide the world quite as neatly. Okay. Then the other things, quickly, factually, was that, which I really don't have time to make, but the ALJ opinion adopted by the Board did talk into the fact that smart leaders, in fact, don't cause these things. But I'll let that speak, because I do want to address them the minute I have left here. The Endicott, Jefferson, Standard, DirecTV, Ron Chavez, Paul Holt, Supreme Court, this Court, and the Board, said it's got to be apparent on its face that it's related to a labor dispute. And that clearly wasn't done here. What did they say on its face? Pardon? What language are we relying on here? I was looking at apparent, Your Honor. That's right, apparent. Things can be apparent without being on the face of something. Yes, but I don't think they let the fact that there's a labor dispute out in the environment be that evidence. Why not? I mean, as I read DirecTV, the interest, which is a quite understandable one, is in allowing those who hear this testimony to put it in context so that they know the interest of the person giving the testimony. Oh, well, he's a labor leader. We know he's against this computerization, cutting into his jobs. We're going to take what he says with a grain of salt, given this battle against smart meters, period. And that makes us look differently at it from, for example, if he is a technology expert or a doctor in the local emergency room who doesn't have that interest, and we're going to say, wow, if the local emergency room doc is down there testifying about safety issues, I, the homeowner, might be more concerned. So I think it's actually quite relevant. It's a question of a reasonable observer. No? Well, a reasonable observer would think he's a 34-year employee, says he knows about fire and heat, and that these things are causing damage to people's homes. I didn't get that communication, but he never says, I'm testifying as part of a labor dispute. He never, and I understand Judge Millett's point, he introduced himself as a union business manager, but he never says this is a dispute or an ongoing battle. In fact, it wasn't. My question is a little bit more general, which is shouldn't we look at the testimony in the context that would be known to a this requirement that his role be apparent is to allow assessment and appropriate skepticism? Well, I think there are some standards to know, Your Honor, and the fact that people may know of a dispute, but the communication has to be, has to link the dispute. Also, regardless of whose burden of proof it is, we think that we did prove that it wasn't, didn't indicate on its face or didn't indicate it was related to an ongoing labor dispute. And regarding the disparaging disloyal aspect, I don't think the board even did an analysis. I'm aware of what they said in the footnote 15, but they didn't set forth the correct standard that is very similar to Endicott, where they did not do an analysis of the factors that this court found are important in Endicott. Were you arguing that it was reckless or that it was maliciously false? What is your position? My position is it's all three of those things, but I'm talking about the disloyal factor. It can't be so disloyal, reckless, or maliciously untrue, but I was focused on the disloyal factor. And I do not believe they did an analysis of the dispute. And the disloyalty you see as lying in what aspect of his actions? His testimony at the hearing was a disparaging remark, fire and heat to the readers, at an Encore product, which is clearly Encore putting them on 3.1 million homes. Which seems to go more to malicious untruth. If it's true that there's some, you know, maybe admittedly limited record of some amount of problems, I mean, you know, from your perspective, what product doesn't have some problems? But I'm trying to part that separately, whether you think there's evidence of disloyalty that wouldn't depend on the degree of untruth of the statement. There's some other, you know, he's not saying to people, you know, boycott this company or they're a bunch of crooks in the accounting office. He's talking about a very disputed question, I understand, of the functionality and the benefit to homeowners of these readers. And that's where you find the disloyalty? Well, the disloyalty in fire and heat to electric distribution company is very similar to counsel for general counsel's allegation about safety in the food business. Fire and heat are very emotionally charged terms. So I think under the standard of what is disloyal, you do have, as I say, a clearly disparaging remark in whether we, of course, do not think it's true. Because of this inaccuracy, in your view? Yes, but I think under truly a disloyal standard, even if it's true, which we clearly say it's not, but a five-star transportation case from the board, for instance, it may be well-intentioned, but that doesn't make it protected. But it was a disparaging comment. I know this is not your position. If it were true, or he reasonably thought it were true, and it relates to the worker's situation, could it nonetheless be disloyal in a way that was supportive of his charge? That's a lot of things that we're saying. So if it's related to the worker's interests, which I know is not, you don't believe that his testimony was, but if it were, and if it were he reasonably, fairly understood it to be true, then could it still be disloyal? I'm trying to understand what separate work disloyalty might or might not be doing in this case, in your view. It could be disloyal if he's, as in Jefferson Sanders, saying something unrelated to the worker's interests or untrue. I think under the standard of disloyalty, as this court held in Endicott, and going through those factors, six factors or so, all of which are present in this case, and the analysis of whether it's true or not wasn't one of those factors, I think it becomes even more serious and more aggravating, as in this case, where there is no underlying, truly no underlying labor dispute. So back to your question earlier about some type of balance to have that meets the factors of Endicott, and on the other hand you have no underlying labor dispute. And so the balance clearly goes towards 10C and the employer's ability to terminate parental subordination, including disloyalty. Can I ask, just to be crystal clear, so the only part of his testimony that you object to as disloyal is the statement, it can't be that I do know a little bit about fire and heat, because that's just, so it's the next clause, and these things are causing damage to people's homes? Is that what's disloyal and disparaging? No, I'm sorry. I think earlier in his testimony, he, too, also says that linking the meter to burning and burning up, I think Senator Corona asked the question, is it attributable to the line on the page of the box, which, of course, it could be, and Reed's response is, in fact, it's the meter. So that's why, Your Honor, we're saying that statement is just as disparaging as, in fact, the end statement that you referenced,  so there's eight or nine things that can cause lugs to break in a burning of the meter base or the meter itself, none of which are the actual meter, and I think that's clearly in the findings in Vendetta. Thank you very much. Did you have, I'll give you one sentence to sum up, since we've let everyone else go on for quite some time and we've pressured you with a lot of questions. Thank you, Your Honor. One sentence. One sentence. One sentence. They did no analysis of malicious, and on that basis, we should have judgment. Thank you very much. Thank you. Case is submitted.
judges: Millett, Pillard, Williams